Filed 7/16/24 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of JILL and GRANT WIESE. | |
| JILL WIESE, Appellant, v. GRANT K. WIESE, Appellant. | G060819, G061168 (Super. Ct. No. 14D010350) ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed on June 20, 2024, be modified as follows:

1. On page 1, in the footnote, after the word "Only," insert the words "the introductory paragraphs," so the sentence reads:

---

* Only the modifications 1 and 2 are certified for publication. (Cal. Rules of Court, rules 8.1105 & 8.1110.)

\* Only the introductory paragraphs, the Facts, part I.A. of the Discussion, and the Disposition are certified for publication.

2. On page 4, in item No. eight listed in the first full paragraph, after the words "attorney fees," insert the words "and costs," so that item No. eight reads:

> (8) the court did not err by limiting Jill's attorney fees and costs under section 2030 based on its view that she had engaged in overlitigation.

3. On page 54, in the last sentence of the first full paragraph, after the words "award of fees," insert the words "and costs," so the sentence reads:

> She also challenges the amount of its award of fees and costs to her under section 2030, contending the court erred by limiting the award based on the merits of her claims.

4. On page 54, in the last sentence of the second full paragraph, after the words "As for fees," insert the words "and costs"; and after the words "withholding fees," insert the words "and costs," so the sentence reads:

> As for fees and costs under section 2030, the court did not abuse its discretion by withholding fees and costs for claims it concluded were baseless and for attorney services it found not reasonably necessary.

5. On page 59, in the first sentence of the first full paragraph, after the word "fees," insert the words "and costs," so the sentence reads:

> We review the denial of attorney fees and costs under section 2030 for abuse of discretion.

6. On page 59, after the first sentence of the first full paragraph, after the citation to "*In re Marriage of Nakamoto & Hsu* (2022)

79 Cal.App.5th 457, 469," insert "; *In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 630."

7. On page 59, after the second sentence of the first full paragraph, delete the word "*Ibid.*" and substitute "*In re Marriage of Nakamoto & Hsu*, at p. 469."

8. On page 59, in the first line of the last paragraph, after the words "withhold fees," insert the words "or costs," so the sentence reads:

> Jill claims this was not a proper basis to withhold fees or costs because "'[t]he aim [of a section 2030 award] is not to "reward" the winner or "punish" the loser.' [Citation.]"

9. On page 60, in the first line of the first partial paragraph, after the words "award of fees," insert the words "and costs."

10. On page 60, in the second line of the first partial paragraph, delete the word "fees" and replace with the word "funds," so the sentence reads:

> limit the award of fees and costs for Jill based on her degree of success; rather, it limited the award of funds expended on groundless claims and other unreasonable expenditures, consistent with California law.

11. On page 60, in the last line of the last full paragraph, after the words "amount of fees," insert the words "and costs," so the sentence reads:

> In short, the court did not abuse its discretion in setting the amount of fees and costs it awarded Jill under section 2030.

12. At the end of the last paragraph on page 60, after the sentence ending "it awarded Jill under section 2030," add the following as footnote 29:

3

[29] In a petition for rehearing, Jill complains that we have not separately addressed her contention that she was entitled to expert witness fees as costs under section 2030. Neither in her appellate briefs nor in her petition for rehearing has Jill attempted to show that a different analysis should apply to these costs. For instance, she has not attempted to show that the relevant experts' work did not relate to the same groundless claims. She has therefore forfeited any such contention. (*Sviridov v. City of San Diego, supra*, 14 Cal.App.5th at p. 521.) We have modified the opinion to clarify that our analysis pertains to Jill's request for costs, in addition to attorney fees.

This modification does not effect a change in the judgment. The petition for rehearing is DENIED.


                                        O'LEARY, P. J.

WE CONCUR:


GOETHALS, J.


GOODING, J.

4

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of JILL and GRANT WIESE. | |
| JILL WIESE,<br><br>    Appellant,<br><br>      v.<br><br>GRANT K. WIESE,<br><br>    Appellant. | G060819, G061168<br><br>(Super. Ct. No. 14D010350)<br><br>O P I N I O N |

Appeals from judgments of the Superior Court of Orange County, Nancy Wieben Stock, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Affirmed in part, reversed in part, and remanded. Requests for judicial notice denied.

---

\*       Only the Facts, Part I.A. of the Discussion, and the Disposition are certified for publication. (Cal. Rules of Court, rules 8.1105 & 8.1110.)

Complex Appellate Litigation Group, Claudia Ribet, Charles Kagay and Robert A. Roth for Appellant Jill Wiese.

Law Offices of Steven E. Briggs, Steven E. Briggs; Greines, Martin, Stein & Richland, Robert Olson and Jeffrey E. Raskin for Appellant Grant Wiese.

* * *

Family Code section 1101, subdivision (d)(2) provides that "[a]n action may be commenced under this section . . . in conjunction with an action for . . . dissolution of marriage."[1] This provision exempts claims for breach of fiduciary duty involving community property from an otherwise applicable statute of limitations. This marriage-dissolution case requires us to decide whether this exemption also extends to claims involving a spouse's separate property. We hold that it does not.

Jill and Grant Wiese were married and worked together for almost 30 years before dissolving their marriage in 2016.[2] When they married, Grant already possessed substantial real estate wealth, whereas Jill had relatively minimal assets. Shortly before the marriage, the parties executed a premarital agreement (PMA), which among other things, provided for near-total separation of the couple's assets and earnings. The PMA also required Grant to provide for the parties' reasonable support.

During most of the marriage, Jill worked as an independent agent for Grant's real estate brokerage, under an agreement that entitled her to 100 percent of her commissions, after deductions for business expenses and

---

[1] Undesignated statutory references are to the Family Code.

[2] Because the parties share a last name, we refer to them by their first names.

2

income taxes. As Jill earned her commissions, Grant would deduct amounts for business expenses and estimated taxes, as well as for amounts he believed Jill owed him for personal expenses exceeding his reasonable-support obligations. However, the amounts Grant deducted for taxes did not correspond with the amounts he ultimately paid based on the parties' joint tax returns. And even when the total tax Grant paid on their combined incomes was lower than what he had deducted from Jill's commissions, he provided her no refund.

In these dissolution proceedings, and after an unsuccessful attempt to invalidate the PMA, Jill brought various claims against Grant. As particularly relevant here, she claimed that his deductions from her commissions constituted breaches of his spousal fiduciary duty and impaired her separate-property interests. Grant countered, inter alia, that Jill's claims for decades of allegedly improper deductions were time-barred. He also contended the claims were meritless, and as to her tax-withholding claims, he asserted he actually deducted too little from her commissions.

The trial court concluded that Jill's fiduciary duty claims were timely based on section 1101, subdivision (d)(2). The court proceeded to find that Grant breached his fiduciary duty by withholding excessive amounts for taxes from her commissions throughout the marriage. It awarded Jill over $1.3 million for these claims. Both parties appealed, challenging various aspects of these and other rulings by the court.

In the published portion of this opinion, we rely on the structure and text of section 1101, its location in the Family Code, the relevant legislative history, and applicable precedents to conclude that this section encompasses only breaches involving community property. Subdivision (d)(2)'s exemption from an otherwise applicable statute of limitation therefore

3

does not extend to Jill's separate-property claims.  Thus, most of Jill's fiduciary duty claims are barred by the applicable four-year statute of limitations.

In the unpublished portion of this opinion, we address the parties' remaining contentions and conclude:  (1) as relevant to Jill's surviving claims, the trial court did not err by determining that Grant breached his fiduciary duty by deducting excessive amounts for taxes from Jill's commissions; (2) the court must fashion a new damages award for these claims; (3) the court must reconsider Jill's claims concerning Grant's deductions for her personal expenses; (4) the PMA did not require Grant to provide Jill additional support for her future retirement needs, nor was the court required to consider Grant's separate-property investments in determining the marital standard of living; (5) under the PMA, a mortgage loan on a lot the parties jointly owned was Grant's sole obligation; (6) under the PMA, the court erred by ordering Jill to reimburse Grant for exclusively occupying the marital home while they were separated but still married; (7) the court must reconsider its determination that Grant was the prevailing party on the PMA in light of its new judgment on remand; and (8) the court did not err by limiting Jill's attorney fees under section 2030 based on its view that she had engaged in overlitigation.  Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

FACTS

I. *The Marriage and the PMA*

The parties married in 1987 and separated for the final time in late December 2015.  The marriage produced two daughters, who are now adults.  The marriage was dissolved in early August 2016 by a judgment on marriage-status only.

4

At the time of the parties' marriage, Grant already had substantial wealth, consisting primarily of interests in real estate assets, with a total value of over $2.5 million. Jill's assets were relatively minimal. Shortly before they married, the parties executed the PMA. The PMA provided that any property belonging to one of the parties at the time of marriage and any property earned or acquired by that party during the marriage would remain that party's separate property. It directed that either party's transfer of property to the other must be in writing, and it provided that filing joint income tax returns would not be deemed a transmutation of separate property to community property.

Under the heading, "Support During Marriage," the PMA imposed two obligations on Grant alone. (Underscoring omitted.) First, it stated, "Grant will provide for the reasonable support of the parties during their marriage[,] and it shall not be necessary for Jill to use any of her property for such purpose." Second, the PMA instructed, "Grant shall indemnify Jill from and against any and all debts incurred during the marriage by him or by her with his express advance consent." The PMA provided that if it became necessary to enforce the agreement in court, the prevailing party would be awarded costs and reasonable attorney fees.

II. *The Parties' Financial Relationship During the Marriage*

During most of the marriage (until they separated), the parties resided together in a house Grant owned. They never shared a common bank account or credit card, but they filed joint tax returns. The parties jointly owned a vacant lot adjacent to the family residence, purchased with a mortgage they both undertook.

As part of his reasonable-support obligations under the PMA, Grant paid for the household's major expenses, such as the costs of family

5

vehicles, medical expenses, and the children's private education. He also provided Jill an allowance for use on other household expenses that fell under his reasonable-support obligations. In the later years of the marriage, this allowance amounted to about $6,000 to $7,000 per month. Grant also allowed Jill to use his credit card for certain household purchases. As discussed more fully below, when he believed certain charges exceeded his reasonable-support obligations, he sought to recover those amounts from Jill.

Early in the marriage, the parties also developed a business relationship. Grant held a real estate broker's license, which he later transferred to one S corporation he wholly owned and then to another.[3] By 1988, Jill began working for Grant as a real estate agent under a commission agreement.[4] Under the commission agreement, Jill was an independent contractor and was to receive, "after expenses and income tax[,] 100% of commissions."[5] (Capitalization omitted.) The agreement provided that it could be amended only in writing.

As Jill earned her commissions, Grant would deduct amounts for business expenses and estimated taxes. He would also deduct amounts he concluded Jill owed him for personal expenses he believed exceeded his reasonable-support obligations. Jill often disagreed with Grant's deductions.

---

[3] Because the parties do not contend the corporate structure affects the analysis of the issues in this appeal, we refer only to Grant for ease of reference.

[4] The parties initially operated under an oral agreement but later executed a written one. We refer to the terms of the written agreement, as the parties do not contend there was a meaningful variance between the two.

[5] It is undisputed that this commission arrangement was unusual, as agents typically receive only 50 to 80 percent of commissions received by the broker, depending on the circumstances.

Regarding the deductions for taxes, she later testified she and Grant "had discussions or arguments almost every month because [she] always felt like [the withholdings] were way higher than they should have been." She recounted that Grant would tell her he was acting on his accountant's instructions and asked her to speak with the accountant. She did not do so because she "didn't think [she] was going to get anywhere with that." We discuss Grant's deductions from Jill's commissions in greater detail in the appropriate sections below.

III. *Jill's Dissolution Petition and Challenge to the PMA's Validity*

In November 2014, before the parties' final separation, Jill filed a petition to dissolve the marriage.[6] In her petition, she asked that her "[p]roperty rights be determined" and requested that assets "to be determined" be confirmed as her separate property. (Capitalization omitted.) She also sought a determination that the PMA was "void, invalid, and unenforceable." The matter was bifurcated for a trial on the validity of the PMA. Following the trial, the court (Judge Clay M. Smith) concluded that

---

[6] For reasons not pertinent to this appeal, the trial court determined that the parties did not finally separate until more than a year after Jill filed her dissolution petition.

7

the PMA was valid and enforceable, rejecting several challenges by Jill.[7] Jill does not challenge these determinations on appeal.

IV. *The Parties' Substantive Claims*

After the trial court held that the PMA was valid and enforceable, the parties proceeded to litigate various claims. In her August 20, 2018, trial brief, Jill asserted, inter alia, that Grant had breached his fiduciary duties to her by wrongfully deducting or over-deducting funds from her real estate commissions, under the categories of taxes and recouping Jill's personal expenses. She claimed Grant was required to account for all her earnings and asked the court to award her the total amount of her past earnings plus appreciation based on the growth in the value of Grant's real estate portfolio, which had grown considerably during the marriage. She also contended she was entitled to an award of attorney fees under section 1101, subdivision (g).[8]

---

[7] Among other things, the trial court rejected Jill's testimony that she did not read the PMA before signing it, finding that she herself had corrected a typographical error in the agreement and signed her initials next to the correction. It also rejected Jill's contention that the PMA was unconscionable. The court found there was no substantive unconscionability, observing that the agreement imposed the same obligations on both parties, with the exception that it placed on Grant the duty to provide Jill with reasonable support during the marriage. It similarly identified no procedural unconscionability, finding that Jill had been advised by independent counsel before signing the PMA, made no attempt to negotiate its terms, and followed the agreement without objection for almost 30 years.

[8] As discussed more fully below, section 1101, subdivision (g) provides in relevant part: "Remedies for breach of the fiduciary duty by one spouse . . . shall include . . . an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs."

8

Jill additionally claimed Grant had failed to comply with his reasonable-support obligations under the PMA. In a later filing, she asserted that under these obligations, Grant was required to provide her money for savings and investments. As for the division of property, Jill asked the trial court to assign the mortgage on their jointly owned lot to Grant alone. Finally, she sought an award of permanent spousal support.

In his filings, Grant opposed Jill's positions. Among other things, he contended that Jill's claims concerning her commissions, which he characterized as breach of contract claims, were barred by the statute of limitations and the equitable doctrine of laches. Grant also contended that his deductions for taxes saved Jill money. And he demanded that Jill reimburse him for her sole use of the marital residence from the date of their separation.

V. *The Trial and Judgments*

After a trial lasting several days, the trial court (Judge Nancy Wieben Stock (Ret.)) issued its statement of decision. Among other things, the court concluded that Grant had breached his fiduciary duty to Jill by withholding excessive amounts for taxes from her commissions throughout the marriage. In so doing, the court rejected Grant's statute of limitations defense, holding that section 1101, subdivision (d)(2) enabled Jill to bring her claims. It did not address Grant's assertion of laches. The court awarded Jill over $1.3 million on the tax-withholding claims based on its calculation of wrongly withheld commissions, plus a 50 percent "penalty" under section 1101, subdivision (g), which it imposed sua sponte, believing it was "*mandatory*."

The trial court additionally ruled: (1) Grant had not breached his fiduciary duty by deducting personal expenses from Jill's commissions;

9

(2) Grant had not breached the PMA's reasonable-support requirement; (3) under the PMA, the mortgage loan on the parties' jointly owned lot was Grant's sole obligation; (4) Jill was obligated to reimburse Grant for exclusively occupying the marital home from the date of separation; and (5) Grant was to pay Jill $15,000 per month in spousal support and maintain a life insurance policy as security for support. The court entered judgment according to these rulings, and both parties appealed.

The trial court later issued a statement of decision on several remaining issues, including attorney fees. As relevant here, the court ruled that Grant was the prevailing party on the PMA and Jill was therefore required to pay him over $261,000 in fees. However, the court also ordered Grant to pay Jill $890,000 for attorney fees and costs under section 2030, though she requested at least $1.5 million.[9] It declined to award Jill attorney fees under section 1101, subdivision (g). The court entered another judgment consistent with these additional rulings, and both parties appealed. We consolidated the appeals of these two judgments.

## DISCUSSION

The parties assert numerous challenges to the trial court's rulings. Grant challenges the court's conclusion that he had breached his fiduciary duty by over-withholding amounts for taxes from Jill's commissions. Alternatively, he challenges the court's computation of damages. He also contends the court erred by assigning the mortgage debt to him alone.

---

[9] As discussed further below, section 2030 affords the trial court discretion to order one party to pay the other "reasonably necessary" attorney fees and costs based in part on the parties' financial circumstances. (§ 2030, subd. (a)(1)-(2).)

10

Jill argues the court erred by: awarding insufficient damages for her tax-withholding claims; rejecting her claims concerning Grant's deductions of personal expenses; determining she was not entitled to additional support for her retirement needs; ordering that she reimburse Grant for her use of the marital home while they were still married; awarding Grant contractual attorney fees; and limiting Jill's attorney fees and costs under section 2030. We discuss the parties' contentions in the appropriate sections below.

I. *Jill's Breach of Fiduciary Duty Claims*

Both parties challenge aspects of the trial court's liability determinations on Jill's claims for breach of fiduciary duty. Grant contends that the court erred by concluding these claims were timely and that, among them, the tax-withholding claims were meritorious. Both parties argue the court erred in calculating its damages award for the tax-withholding claims. Jill additionally asserts the court erred by rejecting her claims regarding Grant's deduction of personal expenses from her commissions.

As discussed below, we conclude that most of Jill's fiduciary duty claims were barred by the statute of limitations. As to her surviving claims, we conclude: (1) the trial court correctly determined that Grant had breached his fiduciary duty by deducting excessive amounts for taxes; (2) the court must fashion a new damages award in light of the guidance we provide; and (3) and the court must reconsider Jill's claims concerning Grant's deduction of personal expenses.

A. *Statute of Limitations*

Grant argues the trial court erred by concluding that Jill's fiduciary duty claims were all timely based on section 1101, subdivision (d)(2). As explained below, we agree. Section 1101, subdivision (d)(2)

11

exempts claims under that section from an otherwise applicable statute of limitations. Jill maintains she qualified for this exemption because her claims arose under section 1101, subdivisions (g) and (h), which provide remedies for certain breaches of spousal fiduciary duties. But based on section 1101's location in the Family Code, the structure and text of its subdivisions, the relevant legislative history, and applicable precedents, we hold that those provisions encompass only breaches relating to community property. Because Jill's claims pertained to her separate property, she could not avail herself of subdivision (d)(2)'s exemption.

1. *Jill's Preliminary Arguments*

Jill asserts Grant may not invoke the statute of limitations for two procedural reasons. First, she claims he should be equitably estopped from invoking the defense because "when Jill raised [her] concerns [about over-deduction of taxes], he took advantage of the fact that Jill trusted him, allaying her suspicions and lulling her into not suing him by insisting that the deductions he was taking were legitimate." Her own testimony refutes this contention. Jill testified she and Grant "had discussions or arguments almost every month because [she] always felt like [the withholdings] were way higher than they should have been." According to her, Grant would respond that he was acting on his accountant's instructions and even asked her to speak with the accountant. Thus, rather than insist the withholding amounts were proper and lulling Jill into inaction, Grant disclaimed knowledge and even invited Jill to investigate further. She chose not to do so because she "didn't think [she] was going to get anywhere with that."

Under these circumstances, no reasonable factfinder would conclude that Grant reasonably induced Jill to refrain from suing him. (See *Doe v. Marten* (2020) 49 Cal.App.5th 1022, 1028 [equitable estoppel may bar

12

asserton of statute of limitations where defendant's conduct "actually and reasonably induced the plaintiff to refrain from filing a timely suit"]; *id.* at p. 1029 ["whether a plaintiff reasonably relied on a nondisclosure of a material fact is a question of fact for the trial court 'unless reasonable minds could reach only one conclusion based on the evidence'"].)

Second, Jill contends Grant forfeited his argument because in the trial court, he confined his statute of limitations argument to contractual claims. But regardless of the precise focus of Grant's argument below, the court rejected his statute of limitations defense by concluding that section 1101, subdivision (d)(2) rendered her claims for breach of fiduciary duty timely. The issue is therefore properly before us. Accordingly, we proceed to address Grant's statute of limitations argument.

2. *Governing Principles and Legal Background*

a. *Standard of Review and Statutory Interpretation*

Statutory interpretation raises questions of law subject to de novo review. (*In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 288.) "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning. [Citation.] We do not, however, consider the statutory language 'in isolation.' [Citation.] Rather, we look to 'the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]' [Citation.] That is, we construe the words in question "'in context, keeping in mind the nature and obvious purpose of the statute . . . ." [Citation.]' [Citation.] We must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.' [Citations.]" (*People v.*

13

*Murphy* (2001) 25 Cal.4th 136, 142.) "We must also avoid a construction that would produce absurd consequences, which we presume the Legislature did not intend. [Citations.]" (*People v. Mendoza* (2000) 23 Cal.4th 896, 908.)

b. *Family Code Provisions Concerning Spousal Fiduciary Duties Generally*

"Section 721 . . . creates a broad fiduciary relationship between spouses in their transactions with each other. This relationship 'imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other.' [Citation.] It also subjects the relationship to the same rights and duties applied to nonmarital partners under the Corporations Code." (*In re Marriage of Simmons* (2013) 215 Cal.App.4th 584, 590 (*Simmons*).)

Among other things, section 721 requires a spouse to (1) provide the other spouse access to any books kept regarding a transaction, (2) upon request, render full information of anything "affecting any transaction that concerns the community property," and (3) account and hold as a trustee any benefit from a transaction by one spouse without the consent of the other that concerns the community property. (§ 721, subd. (b).) Section 2100, another provision setting forth disclosure obligations, requires parties to a marriage dissolution proceeding to fully disclose all assets and liabilities, "regardless of the characterization as community or separate." (§ 2100, subd. (c).)

c. *Division 4, Part 4 of the Family Code and Section 1101*

Division 4, part 4 of the Family Code contains sections 1100 through 1103. It is undisputed that sections 1100, 1102, and 1103 concern only community property. Section 1100 contains specific rules governing a spouse's management of "community personal property." (§ 1100, subds. (a)-(d).) It also references the section 721 fiduciary relationship and declares it applicable to the parties' management of "community assets and

14

liabilities." (§ 1100, subd. (e).) Section 1102 governs "community real property." (§ 1102, subds. (a), (c), (e).) And section 1103 governs control of community property when a spouse has a conservator or lacks legal capacity.

Section 1101 deals with breaches of fiduciary duties between spouses. Its subdivision (a) provides that a spouse has a claim for breach of the fiduciary duty that results in impairment of the "undivided one-half interest in the community estate, including [through] a single transaction or a pattern or series of transactions." Other subdivisions of section 1101 also expressly involve community property. Subdivision (b) allows the court to order an accounting of the parties' property and determine their rights in "community property" and the classification of all their property. Subdivision (c) permits the court to add the name of a spouse to community property or otherwise reform the title of the community property. And subdivision (e) allows the court to permit a transaction in community property without one spouse's consent, under certain conditions.

Subdivision (d) of section 1101 provides the statute of limitations that governs claims under that section. Under subdivision (d)(1), "[e]xcept as provided in paragraph (2), any action under subdivision (a) shall be commenced within three years of the date a petitioning spouse had actual knowledge that the transaction or event for which the remedy is being sought occurred." In turn, subdivision (d)(2) instructs: "An action may be commenced under this section upon the death of a spouse or in conjunction with an action for legal separation, dissolution of marriage, or nullity without regard to the time limitations set forth in paragraph (1)."[10]

---

[10] Given our conclusion that section 1101, subdivision (d)(2) applies only to community property, we do not address Grant's contention that it is merely an exception to the rule stated in subdivision (a).

15

Subdivisions (g) and (h) of section 1101 "provide remedies for claims brought under [that section]." (*In re Marriage of Schleich* (2017) 8 Cal.App.5th 267, 280 (*Schleich*).) Subdivision (g) states, as relevant here, "Remedies for breach of the fiduciary duty by one spouse, including those set out in Sections 721 and 1100, shall include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs." (§ 1101, subd. (g).) And under subdivision (h), where the breach falls within the scope of Civil Code section 3294—meaning it involves oppression, fraud, or malice—"[r]emedies for the breach of the fiduciary duty by one spouse, as set forth in Sections 721 and 1100 . . . shall include . . . an award to the other spouse of 100 percent, or an amount equal to 100 percent, of any asset undisclosed or transferred in breach of the fiduciary duty." (§ 1101, subd. (h).)

d. *The Courts' Construction of Section 1101*

Reviewing section 1101's structure and placement in the Family Code, two Courts of Appeal have held that its remedy provisions, subdivisions (g) and (h), apply only to breaches of fiduciary duty involving community property. (*Schleich, supra*, 8 Cal.App.5th at p. 279; *Simmons, supra*, 215 Cal.App.4th at p. 593.) In *Simmons*, the trial court awarded the entire value of the husband's separate-property savings account to the wife, under section 1101, subdivision (h), for fraudulently failing to disclose the account. (*Simmons,* at pp. 588-589.) The Court of Appeal reversed, holding that although section 1101, subdivision (h) referred to "'any asset,'" its remedy applied only to the nondisclosure of *community* property, not to the nondisclosure of separate property. (*Simmons,* at pp. 593, 595.)

16

In reaching this conclusion, the *Simmons* court noted the placement of section 1101, subdivision (h) "in a portion of the Family Code that *exclusively* concerns matters associated with community property." (*Simmons*, at p. 593.)  And according to the court, reading subdivision (h) together with subdivision (a), which establishes a claim for a breach impairing a community interest, "strongly suggests that 'any asset' [in subdivision (h)] means any *community* asset." (*Simmons*, at p. 593.)

The Court of Appeal added that the Legislature provided remedies that were expressly applicable to nondisclosure of separate property.  (*Simmons, supra*, 215 Cal.App.4th at p. 593.)  Further, the *Simmons* court reasoned that section 1101, subdivision (h)'s remedy showed it was designed with only community property in mind.  (*Ibid.*)  It observed that with respect to community property, the fiduciary duty is intended, among other things, to preserve each spouse's one-half interest and explained:  "Through the enactment of the section 1101 value-of-the-asset remedy [under subdivision (h)], the Legislature has in effect altered the one-half interest community property formula in the event a spouse violates his or [her] duty to preserve the other spouse's one-half right to the property, by awarding the [claimant] spouse *more* than his or her one-half interest.  This one-half interest formula does not apply to separate property; i.e., by its nature separate property is not co-owned by, or divided between, the parties.  Because separate property assets are not subject to equal ownership and division between the parties, it follows that the Legislature's alteration of the one-half interest formula was not meant to be applied to nondisclosure of separate property." (*Id.*, at pp. 593-594.)

The *Simmons* court acknowledged that section 1101, subdivision (h) referenced fiduciary duties under section 721, which are "broad enough to

17

encompass the duty to disclose separate property assets." (*Simmons, supra,* 215 Cal.App.4th at p. 594.) But considering the statute as a whole, it concluded this reference did not reflect an intent to extend the value-of-the-asset remedy to breaches involving separate property. (*Ibid.*)

*Schleich* produced a similar holding for section 1101, subdivision (g). (*Schleich, supra,* 8 Cal.App.5th at p. 279.) There, the trial court awarded the wife remedies under section 1101, subdivisions (g) and (h) for the husband's failure to disclose his separate property during the dissolution proceeding. (*Schleich,* at p. 287.) The Court of Appeal reversed, agreeing with *Simmons*'s analysis and stating it necessarily applied to subdivision (g) as well. (*Schleich,* at pp. 279, 296.) It concluded that section 1101 concerned community property "exclusively." (*Schleich,* at p. 279.) Rejecting the wife's argument that the omission of any reference to community assets in section 1101, subdivisions (g) and (h) must have been purposeful, the *Schleich* court explained: "Subdivisions (g) and (h) provide remedies for claims brought under section 1101. Under subdivision (a), a breach affecting the claimant's community property interest is required to support that claim, making it unnecessary for the remedy provisions also to characterize the relevant asset as a community interest." (*Schleich,* at pp. 279-280.)

3. *The Statute of Limitations Applicable to Jill's Claims*

Generally, the four-year statute of limitations under Code of Civil Procedure section 343 applies to claims for breach of fiduciary duty. (*Thomson v. Canyon* (2011) 198 Cal.App.4th 594, 606.) Jill raised her claims in her August 20, 2018, trial brief, leaving the majority of her claims for

almost three decades of improper deductions outside that period.[11]  The trial court held that all of Jill's claims were timely under section 1101, subdivision (d)(2).  As explained below, we conclude that was error.

a.  *Section 1101, Subdivision (d)(2) Does Not Apply to Claims Involving Separate Property*

Section 1101, subdivision (d)(2)'s exemption from an otherwise applicable statute of limitations applies only to claims under section 1101. As described above, precedent holds that section 1101 deals "exclusively" with community property.  (*Schleich, supra*, 8 Cal.App.5th at p. 279; accord, *Simmons, supra*, 215 Cal.App.4th at p. 593.)  Because Jill's fiduciary duty claims concerned separate property, this exemption did not apply to her claims.

Jill asserts her claims were brought under section 1101, subdivisions (g) and (h), arguing that those subdivisions encompass breaches involving separate property.  She contends subdivision (d)(2)'s reference to actions under "this section" therefore applies to her claims, regardless of their separate-property character.  She maintains that *Simmons* and *Schleich*— which held that subdivisions (g) and (h) concerned only community property—are distinguishable and, in any case, were wrongly decided.

Jill's attempts to distinguish *Simmons* and *Schleich* are unpersuasive.  As Jill notes, both cases involved spouses' failure to disclose their own separate property during dissolution proceedings, whereas Jill's claims involved Grant's misappropriation of her separate property.  But both cases resolved the question before them by construing section 1101—based in

---

[11]     Jill does not argue that the continuing-violation doctrine applied to her claims, and we do not consider that theory.  We discuss more fully below the issue of when the statute of limitations ceased running.

large part on the statute's language, structure, and location—and concluding that its subdivisions (g) and (h) applied only to community property. The same analysis applies equally here, even though the nature of the claimed wrongdoing is different.

Viewed in isolation, the language of subdivisions (g) and (h) of section 1101 does not explicitly confine their remedies to breaches involving community property—they refer to "any asset" transferred in breach of the fiduciary duty. Yet the statutory framework as a whole teaches that they are indeed meant to address only breaches involving community property. (See *People v. Murphy, supra*, 25 Cal.4th at p. 142.)

To begin with, the substance of section 1101, subdivisions (g) and (h) shows they are meant to remedy violations relating to community property. Subdivision (g) provides for an award of 50 percent of an asset that was undisclosed or transferred in breach of the fiduciary duty, or an amount equal to 50 percent. (§ 1101, subd. (g).) This award is not in addition to the return of the claimant spouse's one-half interest in the property. It merely preserves that one-half interest.[12] (*In re Marriage of Gilbert-Valencia & McEachen* (2023) 98 Cal.App.5th 520, 526 [amount equivalent to 50 percent under subdivision (g) is "'*an alternative to* an award of 50 percent of the asset itself' and 'must be the same 50 percent interest that would be awarded in the overall division of community assets'"]; Hogoboom et al., Cal. Practice Guide: Family Law (The Rutter Group 2023) ¶ 8:617, p. 8-241 ["The 50% penalty plus attorney fees and costs constitutes the *full* remedy available under . . . § 1101[, subd. ](g)"].)

---

[12]     In that respect, we note the trial court labored under an erroneous belief that section 1101, subdivision (g) provided for a 50 percent penalty in addition to an award of the affected asset.

Where malice, oppression, or fraud are present, subdivision (h) of section 1101 adds the offending spouse's 50 percent interest in the affected asset to the claimant spouse's 50 percent share. (*In re Marriage of Gilbert-Valencia & McEachen, supra*, at pp. 526-527 ["'under subdivision (h)[,] the claimant spouse is entitled to 100 percent of an asset—his or her 50 percent share plus the breaching spouse's one-half interest in the asset'"].) Subdivisions (g) and (h) were thus tailored to remedy violations involving community property. In the context of claims involving the misappropriation of separate property, this framework would make little sense, as the claimant spouse would be entitled to 100 percent of the affected asset regardless of any malice, oppression, or fraud.

Next, section 1101, subdivisions (g) and (h) must be read in the context of that section's other subdivisions. Subdivision (a)'s creation of a "claim" involving an impairment to the claimant's interest in the "community estate" corresponds with the "remedies" of subdivisions (g) and (h) and restricts their scope (§ 1101, subds. (a), (g), (h); accord, *Schleich, supra*, 8 Cal.App.5th at pp. 279-280.) Other subdivisions of section 1101—subdivisions (b), (c), (d)(1), and (e)—similarly concern community property, and none expressly refers to separate property breaches.

Finally, as *Simmons* observed, and Jill does not dispute, every other section within division 4, part 4 of the Family Code concerns only community property. (*Simmons, supra*, 215 Cal.App.4th at p. 593.) Section 1100 concerns the management of community personal property, section 1102 concerns community real property, and section 1103 concerns community property when a spouse has a conservator or lacks legal capacity.

Jill correctly notes that section 1101's predecessor before the Legislature created the Family Code (former Civ. Code, § 5125.1) was in a

21

chapter that did not deal exclusively with community property. But the Legislature's post-reorganization placement of section 1101 in a part of the Family Code dealing with community property reflects its understanding that this section likewise relates to community property. (Cf. *Stockton Sav. & Loan Bank v. Massanet* (1941) 18 Cal.2d 200, 204 ["[S]ubsequent legislation interpreting the statute" provides "an indication of the legislative intent which may be considered together with other factors in arriving at the true intent existing at the time the legislation was enacted"]; accord, *People v. Harvey* (1980) 112 Cal.App.3d 132, 138-139.)

Like the *Schleich* and *Simmons* courts, we are cognizant that section 1101, subdivisions (g) and (h) reference section 721, which encompasses fiduciary duties concerning separate property in addition to community property. (*Schleich, supra*, 8 Cal.App.5th at p. 279; *Simmons, supra*, 215 Cal.App.4th at p. 594.) But like those courts, we conclude the Legislature did not intend those provisions to cover separate property, given the community-property character of their remedies, the focus of section 1101's other provisions on community property, and that section's location in a part of the Family Code dealing with community property. (*Schleich,* at p. 279; *Simmons,* at p. 594.)

Indeed, section 1101, subdivision (g) included a reference to section 721 when the Legislature enacted the Family Code in 1992. (Former section 1101, subd. (g) ["Remedies for breach of the fiduciary duty by one spouse as set out in Section 721 shall include, but not be limited to, an award to the other spouse of 50 percent . . ."].) Yet a Senate Committee on the Judiciary report addressing Assembly Bill No. 583 (2001-2002 Reg. Sess.) (Assembly Bill 583), which amended section 1101 to its current form, described "[e]xisting law" under former subdivision (g) as providing that

22

"when a court finds a spouse has breached a fiduciary duty to the other spouse regarding management of *community property* . . . , the remedies for the breach shall include, but shall not be limited to, an award to the claimant spouse of 50 percent" of the affected asset.[13]  (Sen. Com. on Judiciary, Analysis of Assem. Bill 583, as amended July 16, 2001, p. 3, underscoring omitted and italics added.)  Again, the Legislature's understanding of the scope of section 1101's subdivisions informs our analysis.  (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244 [although not conclusive, "the Legislature's expressed views on the prior import of its statutes are entitled to due consideration, and we cannot disregard them"].)

In short, the remedies of section 1101, subdivisions (g) and (h) are tailored for community-property breaches and these provisions are located in a section dealing with community property, in a part of the Family Code concerning community property.  Based on this holistic evaluation of the

---

[13]  Both parties have asked us to take judicial notice of various published legislative history materials.  We deny those requests as unnecessary.  (*Wittenburg v. Beachwalk Homeowners Assn.* (2013) 217 Cal.App.4th 654, 665, fn. 4 ["A motion for judicial notice of published legislative history . . . is unnecessary" and "'[c]itation to the material is sufficient'"].)

Among other changes, Assembly Bill 583 amended section 1101 to expand the category of fiduciary duty breaches involving community property that could be addressed under this section.  Subdivision (a) of section 1101 previously referred to "a breach of the fiduciary duty *imposed by Section 1100 or 1102*" resulting in impairment to the claimant spouse's interest in the community estate.  (Former § 1101, subd. (a), italics added.)  Assembly Bill 583 changed this subdivision to refer to "*any* breach of the fiduciary duty" resulting in such impairment.  (§ 1101, subd. (a), italics added.)  It similarly amended subdivision (g), which previously referred to breaches "as set out in Section 721" (former § 1101, subd. (g)), changing it to refer to breaches "including those set out in Sections 721 and 1100" (§ 1101, subd. (g)).

statutory framework, we conclude subdivisions (g) and (h) apply only to community-property claims.

b. *Jill's Arguments Based on Legislative History and Policy Are Unpersuasive*

In arguing that section 1101's remedy provisions encompass separate property claims, Jill directs us to the legislation that first added subdivisions (g) and (h) to former Civil Code section 5125.1, Senate Bill No. 716 (1991-1992 Reg. Sess.) (Senate Bill 716) (Stats. 1991, ch. 1026). Through Senate Bill 716, the Legislature "intend[ed] to clarify the management standards" governing the respective predecessors of Family Code sections 721 and 1100, former Civil Code sections 5103 and 5125. (Stats. 1991, ch. 1026, § 1, p. 4747.) Thus, although existing law already provided that in transactions between themselves, spouses were "subject to the general rules which control[led] the actions of persons occupying confidential relations with each other" (Legis. Counsel's Dig., Sen. Bill 716), Senate Bill 716 amended former Civil Code section 5103 to provide that this confidential relationship was "a *fiduciary* relationship subject to the same rights and duties of nonmarital business partners." (Stats. 1991, ch. 1026, § 2, pp. 4747-4748, italics added.)

Senate Bill 716 also amended former Civil Code section 5125.1, subdivision (a). This subdivision already provided a claim for "breach of the duty imposed by [former Civil Code] Section 5125 or 5127 [now Family Code sections 1100 and 1102] that results in impairment to the claimant spouse's present undivided one-half interest in the community interest" (Stats. 1986, ch. 1091, § 2, p. 3815), but Senate Bill 716 added that this was a "fiduciary" duty and that a breach could be accomplished through "a single transaction or a pattern or series of transactions." (Stats. 1991, ch. 1026, § 4, p. 4750.) Finally, Senate Bill 716 added subdivisions (g) and (h) to former Civil Code

24

section 5125.1.  As relevant here, subdivision (g) provided its remedies "for breach of the fiduciary duty by one spouse as set out in [former Civil Code] Section 5103," while subdivision (h) did not reference any statute to define the scope of the relevant fiduciary duty.  (Stats. 1991, ch. 1026, § 4, p. 4750.)

Jill makes two arguments based on Senate Bill 716.  First, she relies on the text of former Civil Code section 5125.1, subdivisions (g) and (h) under that enactment.  She highlights that while that section's subdivision (a) referred to two statutes (former Civil Code sections 5125 and 5127) to define the scope of the duty, subdivision (g) referred to a different statute (former Civil Code section 5103), and subdivision (h) referenced no statute.  She claims this shows the Legislature did not intend subdivisions (g) and (h) to be coextensive with subdivision (a).

Jill's conclusion does not follow from these different references.  Like Family Code section 1100, former Civil Code section 5125 under Senate Bill 716 provided specific rules governing a spouse's management of "community personal property" (former Civ. Code, § 5125, subds. (a)-(d); Stats. 1991, ch. 1026, § 3, p. 4748), but also referenced the fiduciary duties under former Civil Code section 5103 (section 721's predecessor) and made it applicable to the parties' management of community property.  (Former Civ. Code, § 5125, subd. (e); Stats. 1991, ch. 1026, § 3, p. 4749.)  So when former Civil Code section 5125.1, subdivision (a) referenced fiduciary duties under former Civil Code section 5125, it necessarily included duties under former Civil Code section 5103.  Subdivision (g) of former Civil Code section 5125.1 therefore referred to a subset of the community-property related claims under that section's subdivision (a).  Subdivision (h) of that statute immediately followed subdivision (g), and we do not read its omission of a statutory source

25

of fiduciary duties to provide for a harsher penalty for the breach of a broader category of duties.

Second, Jill argues the Legislative Counsel's Digest for Senate Bill 716 supports her position.  After noting the bill's clarification that spouses "are subject to the general rules governing fiduciary relationships" and have the same duties as unmarried business partners, the digest stated: "This bill would, in this connection, (1) revise requirements with respect to the disclosure and notice that must be provided by one spouse to the other spouse, (2) revise provisions related to when a spouse may bring a claim against the other spouse for breach of this fiduciary duty, (3) recast and clarify the circumstances in which a spouse may make a gift or dispose of community personal property without the consent of the other spouse, and (4) provide additional remedies for breach of this fiduciary duty by a spouse to the other spouse."  (Legis. Counsel's Dig., Sen. Bill 716.)

Jill contends the phrase "*additional remedies* for breach of this fiduciary duty" in the Legislative Counsel's Digest refers to former Civil Code section 5125.1, subdivisions (g) and (h) and shows that they provided remedies "for the broad range of fiduciary duties to be found in section 721." (Italics omitted.)  We agree that subdivisions (g) and (h) were the additional remedies the digest referenced.  But we disagree that the digest described them as applicable to *any* breach of section 721.  In context, the phrase "this fiduciary duty" refers to the spousal fiduciary duty generally, a new concept under Senate Bill 716.  The digest did not attempt to describe the conditions under which subdivisions (g) and (h) would apply.

Jill highlights the statement in the Legislative Counsel's Digest that Senate Bill 716 would "revise provisions related to when a spouse may bring a claim . . . for breach of this fiduciary duty" and claims the statement

26

must refer to former Civil Code section 5125.1, subdivision (d) (now Fam. Code, § 1101, subd. (d)), because that is the only provision that dealt with a claim's timing. She recognizes that Senate Bill 716 did not revise subdivision (d) and argues the digest's statement meant that the addition of subdivisions (g) and (h) "would cause subdivision (d) to govern when a spouse could bring a claim [under those provisions] for a breach of the fiduciary duty set forth in what is now Family Code section 721." We are unpersuaded.

The digest's reference to "when" a claim may be brought simply related to Senate Bill 716's amendment of former Civil Code section 5125.1, subdivision (a), which dealt with the *conditions* for a claim. (Legis. Counsel's Dig., Sen. Bill 716.) If the reference to "provisions related to when" a claim may be brought were meant as an oblique reference to subdivisions (g) and (h), we would expect it to have adjoined the digest's note that Senate Bill 716 would provide additional remedies. (Legis. Counsel's Dig., Sen. Bill 716.) Yet an unrelated comment about unilateral disposition of community property separates the two.

Jill additionally claims it "makes no sense" to think the Legislature would want to provide harsher remedies for misappropriation of community property. But it is not senseless for the Legislature to be particularly concerned about violations involving community property. The Legislature may have believed it was more common for one spouse to manage—and be in a position to misuse—community assets than for one spouse to manage the other spouse's separate property. It may also have believed that even under the latter scenario, a spouse would be more likely to closely monitor the management of his or her separate property by the other spouse.

27

In sum, we conclude section 1101, subdivisions (g) and (h) encompass only breaches relating to community-property based on section 1101's text and structure, its location in the Family Code, the relevant legislative history, and applicable precedents. Likewise, section 1101, subdivision (d)(2), which applies only to claims under that section, covers only community-property claims. Accordingly, Jill's fiduciary duty claims are subject to Code of Civil Procedure section 343's statute of limitations.

4. *When the Statute of Limitations Ceased to Run*

As noted, Jill raised her fiduciary duty claims for the first time in her August 20, 2018, trial brief. Thus, the four-year statute of limitations under Code of Civil Procedure section 343 barred claims that accrued before August 20, 2014. We leave to the trial court the precise determination of which of Jill's claims were timely.

Jill contends the filing of her November 2014 dissolution petition—not her August 2018 trial brief—stopped the running of the statute of limitations. We disagree. Jill's petition asked only that her "[p]roperty rights be determined" and that assets "to be determined" be confirmed as her separate property. (Capitalization omitted.) These requests gave Grant no notice of the facts underlying Jill's subsequent fiduciary duty claims based on wrongful deductions from her commissions. They therefore could not have stopped the running of the statute of limitations for those claims. (See *Hutcheson v. Superior Court* (2022) 74 Cal.App.5th 932, 940 [""The policy behind statutes of limitations is to put defendants on notice of the need to defend against a claim in time to prepare a fair defense on the merits""]; *Davaloo v. State Farm Ins. Co.* (2005) 135 Cal.App.4th 409, 416 ["a plaintiff who files a complaint containing no operative facts at all cannot subsequently amend the pleading to allege facts and a theory of recovery for the first time

28

and claim the amended complaint should be deemed filed as of the date of the original"].)

Grant argues, without elaborating, that only claims relating to commissions paid in 2015 were timely under the four-year statute of limitations. But as noted, the four-year period encompasses claims accruing in and after August 2014. We question whether claims for over-withholding taxes from Jill's 2014 commissions could have accrued before the parties filed their taxes and Grant paid a lower tax on her income than he had withheld, presumably sometime in 2015. Had Grant paid the same amount he withheld from Jill, there would have been nothing objectionable about his withholding of taxes pursuant to the parties' commission agreement. Nevertheless, we do not decide the issue and do not constrain the trial court's determination of the timeliness of Jill's claims, consistent with our conclusions on the applicable statute of limitations and when it stopped running.[14]

---

[14] Grant argues Jill's claims are all barred by laches. This defense requires a showing that the claimant unreasonably delayed in asserting his or her rights, causing prejudice to the adverse party. (*In re Marriage of Powers* (1990) 218 Cal.App.3d 626, 642-643.) Whether laches applies is subject to a trial court's discretion. (*Id.* at p. 643.)

The court impliedly rejected Grant's assertion of laches, and he fails to show this was an abuse of discretion. Grant's contention that Jill unreasonably delayed in asserting her claims assumes she delayed for "decades." He offers no meaningful argument that Jill unreasonably delayed in bringing those claims that survive the statute of limitations. This failure is particularly relevant because "[i]n determining the reasonableness of a delay in filing an action, the courts are guided by the applicable statute of limitations. [Citation.]" (*David Welch Co. v. Erskine & Tulley* (1988) 203 Cal.App.3d 884, 893, disapproved on another ground by *Lee v. Hanley* (2015) 61 Cal.4th 1225, 1239; see also *Pease v. Zapf* (2018) 26 Cal.App.5th 293, 301 [contestant of election results complied with limitation period, "undercut[ting] [opponent]'s claim of unreasonable delay"].)

B. *Jill's Surviving Fiduciary Duty Claims*

1. *Grant's Over-withholding of Taxes*

Grant contends the trial court erred by concluding that Jill's tax-withholding claims were meritorious. He argues, inter alia, that the court erred by shifting the burden of proof to him and that Jill actually benefited from his withholding practices because she would have paid more in taxes had she filed her taxes separately. Alternatively, he asserts the court erred by awarding Jill the entire amount of his estimated withholdings for taxes, rather than the difference between the withholdings and the actual tax paid. Jill contends the court erred by finding that Grant withheld an average of only 30 percent of her commissions and by failing to apply prejudgment interest and appreciation to its award.

As discussed below, undisputed evidence established that Grant had breached his fiduciary duty to Jill by deducting from her commissions amounts for taxes that exceeded the taxes he actually paid on her income and failing to refund the excess amounts. However, we agree with Grant that the trial court erred by awarding Jill the entire amount of estimated withholdings, rather than only the amount that exceeded taxes paid on Jill's income. We find no error based on Jill's challenges to the court's award.

a. *Background*

As described, the parties' commission agreement entitled Jill to 100 percent of commissions after deduction of expenses and income tax. As Jill earned commissions, Grant would deduct estimated federal and state income taxes and retain those funds in his accounts. He testified he based the amounts he retained on his accountant's recommendations.

Although Jill was an independent contractor, she did not receive a 1099 tax form and her income was not reported to tax authorities as her

30

own. Instead, Grant reported her income as that of his S corporation, which in turn was reported as his own income on the couple's joint tax returns.[15] Jill's business expenses were similarly reported as the S corporation's expenses, which had the effect of lowering Grant's reported income on the joint returns. According to Grant, the parties used this tax reporting scheme because it was advantageous to both of them.

After the first two years of the parties' joint work, Grant began providing Jill with commission statements, which detailed her gross commissions and all the amounts Grant deducted, including the amounts he retained for taxes. By the time of trial, Grant had discarded all but a few of these commission statements, and Jill had retained none. Grant produced a schedule of Jill's gross commissions earned and net commissions paid from 2002 to 2014, but it did not detail his deductions.

Grant testified he would deduct 30 to 40 percent of Jill's commissions for taxes. On cross-examination, he agreed this was the typical range, and added "or less." When Jill's counsel presented a particular commission statement reflecting a deduction of 40 percent for taxes, counsel asked if that was what Grant was "typically taking out of Jill's commissions," and Grant answered, "Yes." Jill testified Grant typically took out 40 percent of her commissions for taxes. And the few commission statements admitted at trial reflected withholdings that ranged between 28 and 41 percent for taxes.

The amounts Grant withheld had no obvious relation to the amounts he paid in taxes on the parties' combined incomes. Even when the

---

[15]     In her opening brief, Jill suggests Grant did not report her income at all. In her reply brief, however, she acknowledges that he "lump[ed] his and [her] income and deductions onto the couple's joint return."

31

total amount of taxes paid by the parties was lower than the amount Grant had taken from her commissions, he never refunded any of the withheld monies to Jill.

For tax year 2007, Grant paid $13,389 in federal income tax and $9,452 in state income tax. At trial, he did not dispute that based on his typical withholdings, he would have retained between $77,925 and $103,900 from Jill's commissions that year (which totaled about $260,000). For 2000, Grant paid $12,450 in federal income tax and $1,792 in state income tax. At trial, he agreed that based on his typical withholdings, he would have retained between $134,000 and $179,000 from Jill's commissions that year (which totaled about $450,000). He refunded no money to Jill for those years. After questioning Grant about the tax and withholding amounts for 2000, Jill's counsel asked him if he had told Jill this was "a fair deal for her." Grant replied: "Put it in those terms, no. She had the ability to look at the tax returns. She signed the tax return. I never stopped her from calling [the accountant]. I encouraged her if she had questions."

Jill claimed Grant's withholding and retention of excessive amounts for taxes from her commissions constituted breaches of his fiduciary duty. Grant countered that Jill never suffered damages due to his withholding practices because they "sav[ed] her money in taxes," to his detriment. He called a forensic accounting expert, who testified about his computation of Jill's tax liability from 2002 to 2014 under a hypothetical scenario in which she was entitled to only 80 percent of her income, her income was reported as her own, and she filed her taxes separately. Based on his calculations of federal income tax, federal self-employment tax, and state income tax, the expert concluded that under this scenario, Jill would

32

have paid over $133,000 more than Grant had withheld from her commissions.

The trial court concluded Grant had breached his fiduciary duty by withholding excessive amounts for taxes from Jill's commissions. Initially, the court found that extraordinary circumstances warranted shifting to Grant the burden to prove he "actually paid taxes in the amounts withheld." Among other things, the court determined that Grant had "exclusive access to the relevant financial and tax records," that Jill "lacked the critical information about her actual year-end tax bracket," and that Grant never offered to refund "the difference between the large withholding amount and their greatly reduced actual tax burden."

The trial court found that Grant harmed Jill "by the deliberate withholding of taxes in amounts she never actually owed" and noted that "[t]he funds deducted excessively from her commissions went to Grant's control and were never restored to her." The court added: "It is no defense that, had Grant paid and reported commission payments to Jill as a 1099 contractor, she would have had to pay taxes on those commissions. Grant chose not to do it that way, and he must live with the consequences."

In determining damages, the trial court found that "Grant should be charged with having deducted an average of 30% in tax withholding." The court awarded that 30 percent from Jill's total commissions to her and added a "50 percent penalty" on that amount, sua sponte, under section 1101, subdivision (g), "in lieu of imposing [prejudgment] interest." It rejected Jill's request that the misappropriated funds "be multiplied by the same factor of appreciation as Grant's overall investment portfolio," finding that the evidence did not support her "assumption" that Grant had used the money to "fund or advance the value" of his existing real estate portfolio. Elsewhere in

33

its statement of decision, the court found that Grant "never reinvested his earnings or investment income into real estate."

b. *Analysis*

(1) *Breach*

The existence and scope of a marital fiduciary duty are matters of law we review de novo. (*In re Marriage of Kamgar* (2017) 18 Cal.App.5th 136, 144.) The interpretation of a contract without resort to extrinsic evidence is likewise subject to de novo review. (*Saeta v. Superior Court* (2004) 117 Cal.App.4th 261, 267.) We interpret a contract according to the parties' mutual intention, based solely on its written provision, if possible. (*State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 195.) Whether a fiduciary duty has been breached is a question of fact that we review for substantial evidence, considering the evidence in the light most favorable to the court's ruling. (*In re Marriage of Kamgar*, at p. 144.)

We find no error in the trial court's conclusion that Grant breached his fiduciary duty to Jill by over-withholding taxes from her commissions and retaining the excessive sums. As her husband, Grant owed Jill a fiduciary duty that prohibited him from taking "unfair advantage" of her. (§ 721, subd. (b).) Grant does not contest the court's finding that he withheld an average of 30 percent from Jill's commissions for taxes. Nor does he contend that he actually paid taxes on her income in those amounts. And it is undisputed that, although the parties' commission agreement permitted Grant to deduct only "income tax," he kept for himself any difference between what he deducted from Jill and what he paid in taxes on her income. (Capitalization omitted.) By misappropriating funds belonging to Jill under

34

his control, Grant took unfair advantage of her and breached his fiduciary duty to her.[16]  (§ 721, subd. (b).)

Grant argues Jill actually benefited from his withholding practices because she would have paid even more in taxes had she received a 1099 form and filed taxes separately.  He contends Jill was not "entitled to his separate property deductions."  According to Grant:  "Jill was not taken 'advantage of' . . . if she ended up in the same or better financial position than if she had paid the IRS directly based on the only deductions that she was entitled to.  Nor is it 'unfair' that Jill contribute[d] the same or less withholdings than she otherwise would have paid based on her own deductions."

Grant's position is unsound.  The parties' commission agreement entitled Jill to 100 percent of her commissions after expenses and "income tax"; it did not authorize Grant to keep to himself amounts Jill *would have paid* in income tax and self-employment tax under a hypothetical scenario in which Jill received a 1099 form and filed separately.  (Capitalization omitted.)  Because Grant ran Jill's income through his S corporation and reported it as his own on their joint tax return, the tax rate paid on her income was the joint return's effective tax rate—total tax divided by total taxable income.  Under the parties' commission agreement, that was the appropriate benchmark to assess whether Grant's withholding practices left Jill worse off, not a rate based on a tax-filing scheme the parties never used.

---

[16]        Grant claims the trial court erred by shifting to him the burden to prove he "actually paid taxes in the amounts withheld."  We need not address the issue because Grant does not contend he paid taxes in the amounts withheld and the essential facts are undisputed.

35

Although Jill may not have been *entitled* to benefit from Grant's deductions, he elected to apply his deductions to their combined incomes, just as he applied deductions for Jill's business expenses to their combined incomes. According to Grant, the parties used this tax-reporting scheme because it was advantageous to both of them. Having reaped whatever benefits that scheme provided him, he may not disclaim it now.[17]

For some tax years, Grant's withholding practices yielded him significant windfalls at Jill's expense. As noted, according to his testimony about his typical withholdings, in 2007, Grant withheld between $77,925 and $103,900 from Jill when the couple's total income-tax liability for that year was only about $23,000, yet he did not return any funds to Jill. Similarly, in 2000, Grant withheld between $134,000 and $179,000 from Jill's commissions but paid only about $14,000 in income taxes for their combined incomes that year. When confronted with these figures at trial, Grant acknowledged that this was not "a fair deal for [Jill]." Taken to its logical conclusion, Grant's position would mean that he had the right to withhold from Jill and keep for himself any amount up to the amount she would have paid as a single filer, even if because of their combined deductions he paid no tax at all on their combined incomes. That is not what the commission agreement dictated.

The combination of the commission agreement and Grant's election to file taxes jointly meant that Jill was entitled to her entire commissions minus expenses and actual tax paid based on the parties' effective tax rates. Grant may now believe that result is too favorable to Jill,

---

[17]    We emphasize that, contrary to Grant's suggestion, our analysis does not assume that the mere manner of listing the parties' incomes on their joint tax returns transmuted his property (something the PMA refutes). Rather, we conclude the commission agreement entitled Jill to the entirety of her commissions, minus expenses and actual tax paid on her income.

but that is what the commission agreement provided for, and that is what defined Grant's fiduciary obligations to Jill. By withholding and keeping for himself excessive amounts of Jill's funds, he breached those obligations. (§ 721, subd. (b).)

(2) *Damages*

Both parties challenge the amount of the trial court's award for Jill's tax-withholding claims. Grant contends the court erred by awarding Jill the entire amount of his estimated withholdings, rather than the amount by which they exceeded the couple's effective tax rate.[18] Jill claims the court erred by finding that Grant withheld only 30 percent from her commissions for taxes, by failing to award prejudgment interest, and by failing to order an accounting and include an appreciation factor in its award.

"We review the trial court's damages award for substantial evidence." (*Godfrey v. Oakland Port Services Corp.* (2014) 230 Cal.App.4th 1267, 1285.) As discussed below, we agree with Grant that the court erred by awarding Jill the entire amount of his estimated withholding. We find no other error in the court's award.

_____

[18] Grant also challenges the trial court's imposition of a 50 percent penalty under section 1101, subdivision (g), asserting this provision does not apply to Jill's separate-property claims. As explained above in the discussion of the statute of limitations, this provision does not apply to claims involving separate property. (*Schleich, supra*, 8 Cal.App.5th at p. 279; *Simmons, supra*, 215 Cal.App.4th at p. 593.) Accordingly, we agree with Grant that it was error to apply section 1101, subdivision (g) here, and we do not discuss the issue further. Our conclusion moots Jill's challenges to the court's computation of its penalty under subdivision (g), its failure to award attorney fees under that provision, and its failure to impose a penalty under subdivision (h).

(a) *The Trial Court's Award of the Entire Amount of Estimated Withholdings*

The trial court erred by awarding Jill the entire amount of estimated tax withholdings, rather than the difference between those withholdings and the actual amount paid on her earnings based on the effective tax rate. The parties' commission agreement permitted Grant to withhold "income tax" from Jill's commissions. (Capitalization omitted.) As discussed above, Grant breached his fiduciary duties because he withheld too much and did not return excess amounts to Jill. The resulting damages are therefore only those excess amounts, not the entire amounts withheld. The parties' tax documents contain their effective tax rates for the relevant period and will allow the court to calculate the excess amounts.[19]

Accordingly, we conclude the trial court applied the wrong analysis to calculate the damages to Jill. On remand, it must use the parties' effective tax rates to determine the amount of the award.

(b) *Grant's Average Withholding Rate*

Contrary to Jill's contention, the evidence supported the trial court's finding that Grant deducted an average of 30 percent for taxes from her commissions. The evidence before the court consisted of the parties' testimonies about Grant's typical withholdings, a few commission

---

[19]     We observe that Jill's own counsel followed this approach in his closing argument, stating that Grant should get "credit" for the taxes he paid on Jill's income, calculated by "figur[ing] out what percentage of the parties' income was paid towards taxes" and "t[aking] that percentage and appl[ying] it to Jill's commissions." It is undisputed that the parties possessed all of their joint tax returns.

Jill suggests Grant forfeited his contention regarding the trial court's methodology by failing to raise it below. We find no forfeiture because Grant asserted below that any harm to Jill depended on an appropriate calculation of her tax liability.

statements, and a schedule of Jill's gross commissions earned and net commissions paid since 2002. This evidence did not enable the court to calculate an arithmetic average of withholdings for taxes throughout the parties' decades of working together. The court therefore permissibly selected a rate it concluded represented a typical withholding rate that could be fairly applied across the board. (See *Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962, 978-979 [amount of damages is factual question committed to factfinder's discretion].)

The rate the trial court selected—30 percent—was reasonable based on the evidence: Grant testified he typically withheld 30 to 40 percent "or less" from Jill's commissions for taxes. And the few commission statements admitted at trial reflected deductions for taxes ranging from 28 to 41 percent. Jill is therefore mistaken in her assertion that undisputed evidence showed Grant typically withheld 40 percent of her commissions for taxes.

Jill points to her counsel's cross-examination of Grant, in which counsel questioned Grant about a commission statement reflecting a withholding of 40 percent. Counsel asked if that was what Grant was "typically taking out of Jill's commissions," and Grant answered, "Yes." In the context of Grant's entire testimony, his answer is most reasonably understood to say that the 40 percent withholding in this commission statement was within the typical range, and the trial court was entitled to interpret it this way.

Accordingly, we find no error in the trial court's determination of Grant's average tax withholding rate. Given the significant narrowing of Jill's tax-withholding claims based on the statute of limitations, the court

39

may consider on remand whether the evidence reflects other withholding rates for the relevant years.

(c) *Prejudgment Interest*

The trial court did not err by declining to award Jill prejudgment interest. Under Civil Code section 3287, subdivision (a), a person entitled to recover "damages certain, or capable of being made certain by calculation," is also entitled to interest from the time the right to recover arises. "'Damages are deemed certain or capable of being made certain within the provisions of subdivision (a) of [Civil Code] section 3287 where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable . . . .' [Citation.]" (*Wisper Corp. v. California Commerce Bank* (1996) 49 Cal.App.4th 948, 958.) "The statute does not authorize prejudgment interest where the amount of damage . . . 'depends upon a judicial determination based upon conflicting evidence . . . .' [Citations.]" (*Fireman's Fund Ins. Co. v. Allstate Ins. Co.* (1991) 234 Cal.App.3d 1154, 1173.)

The damages the trial court awarded could not have been made certain before trial because they depended on the court's selection of a 30 percent withholding rate that, as discussed above, was not based on an arithmetic calculation. (*Wisper Corp. v. California Commerce Bank*, *supra*, 49 Cal.App.4th at p. 958.) Accordingly, Jill was not entitled to prejudgment interest under the court's original award. However, the circumstances may be different on remand. If, given the more restricted scope of the claims, the court can determine Grant's actual withholdings (and the parties' effective tax rates) based on undisputed evidence, the damages would be rendered certain, and the court should award interest.

(d) *Accounting and Appreciation*

The trial court did not err by declining to order an accounting and failing to include an appreciation factor in its award. Claimants suing for breach of fiduciary duties have "'the right to elect the kind of relief they seek.' [Citation.]" (*Center for Healthcare Education and Research, Inc. v. International Congress for Joint Reconstruction, Inc.* (2020) 57 Cal.App.5th 1108, 1125.) Among the alternative remedies are damages and a variety of equitable remedies, including disgorgement of profits. (*Ibid.*)

The trial court rejected Jill's request that her misappropriated funds "be multiplied by the same factor of appreciation as Grant's overall investment portfolio" because it found that the evidence did not support her "assumption" that Grant had used the money to "fund or advance the value" of his existing real estate portfolio. This was consistent with the court's finding that Grant "never reinvested his earnings or investment income into real estate," a finding Jill does not challenge. Similarly, although Jill claims the court should have ordered Grant to provide an accounting of his use of the misappropriated funds, the court could reasonably have determined that an accounting was not necessary to determine if Grant had invested those funds in real estate because it found that he never did so.

2. *Grant's Deductions for Jill's Personal Expenses*

Jill argues the trial court erred by failing to remedy Grant's deduction of some of Jill's personal expenditures because the commission agreement did not authorize those deductions. We conclude the court must reconsider her claim on remand as explained below.

a. *Background*

As noted, in addition to the monthly allowance Grant provided Jill, he allowed her to use his credit card for certain purchases. He would

41

then review the charges on his card and evaluate whether they were part of his reasonable-support obligation under the PMA. For the charges he thought exceeded his reasonable-support duty, he sought repayment from Jill. Generally, he would later deduct those charges from Jill's commissions. He sometimes also deducted other amounts he believed Jill was required to repay him. In her trial brief, Jill claimed that Grant breached his fiduciary duties by deducting these funds from her commissions.

At trial, the parties disputed the process that preceded Grant's personal-expense deductions. Grant testified he always discussed his proposed deductions with Jill and "never" deducted from her commissions any amounts for personal expenses unless she agreed. On the other hand, Jill testified Grant would simply give her a check with the deductions already included. She claimed she "tried to negotiate" over the deductions but Grant "[r]arely" agreed to adjust them. On cross-examination, Grant's counsel presented Jill with exhibit No. 650, which included a commission statement bearing Jill's handwritten notations. Jill agreed this commission statement showed she negotiated with Grant on the deductions from the relevant commissions: Grant proposed she receive about $98,500, Jill sought $122,000, and the parties settled on $121,500.

The trial court rejected Jill's claim that Grant breached his fiduciary duty by making these deductions. In recounting the facts, the court said, "It was apparent from the testimony that Grant and Jill did not always agree on the deductions." Turning to address the merits of Jill's claim, the court stated: "Jill clarified that she does *not* agree [this] category of deductions was appropriate. However[,] the evidence demonstrated that Jill knew of these deductions and the reasons for them. Further, since Grant derived these deductions from detailed credit card charges[,] Jill was able to

42

review and question these charges. There is evidence she prevailed in her position, when Grant's proposed deductions were successfully challenged, and then reversed. (Tr. Exh. 650). [¶] Jill[] complains that she did not receive a sufficient net commission because Grant overstated reimbursements for personal expenses. This claim is weakened by the fact that [her] gross commission . . . was artificially boosted due to a voluntary arrangement between the parties. . . . Normally, a broker could be expected to pay its sales agent . . . 50-80% [of the commission collected], depending upon the circumstances. . . . [¶] . . . Since the parties voluntarily agreed to maintain Jill at a 100% commission rate, it is inappropriate, 32 years later, to unwind only one portion of the arrangement, using Jill's 100% commission to reimburse Grant for certain personal expenses."

b. *Analysis*

We conclude the trial court must reconsider Jill's claim concerning Grant's deductions of her personal expenses. Grant's deduction of funds in this category breached his fiduciary duty if he took "unfair advantage" of Jill by doing so. (§ 721, subd. (b); see also *In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 732 [based on section 721's language, "in a contractual exchange between spouses, a presumption of undue influence arises only if one of the spouses has obtained an *unfair* advantage over the other"].)

At trial, the parties disagreed on the extent to which they had negotiated and agreed on the deductions in this category. Grant testified that he would discuss his proposed deductions with Jill and "never" deducted funds in this category unless Jill agreed. Jill testified that Grant would simply give her a check with these deductions included, and she then "tried to negotiate" them, but he "[r]arely" agreed to adjust them.

43

It appears the trial court rejected Grant's position but did not expressly adopt Jill's. It found that "[i]t was apparent from the testimony that Grant and Jill did not always agree on the deductions," though it noted that Jill knew about them, was able to review and question the underlying charges, and sometimes "prevailed in her position." It then proceeded to discuss whether the deductions were "overstated." We read the court's statement of decision to reflect findings that during the marriage, Jill agreed in principle that Grant could make deductions in this category from her commissions but sometimes disagreed with him on whether particular deductions were warranted.

Where Jill agreed that Grant deduct funds as repayment of sums she owed him, his doing so was not taking "unfair advantage" of her. (§ 721, subd. (b).) Jill contends it does not matter if she orally agreed to the deductions because the PMA required any transfer of her separate property to Grant to be in writing. But that Grant's deductions may have violated the PMA even with Jill's agreement does not mean that Grant took unfair advantage of Jill and therefore breached his fiduciary duty. Jill does not meaningfully argue that a breach of the PMA translates to an unfair advantage, and she has therefore forfeited the issue.[20] (*Sviridov v. City of San Diego* (2017) 14 Cal.App.5th 514, 521 [failure to present reasoned argument constitutes forfeiture].)

The analysis is different for deductions to which Jill did not agree. Nothing justified Grant's unilateral decisions to take funds out of Jill's

---

[20]    In her trial brief, Jill did not assert her claim concerning these deductions (separate from Grant's reasonable support obligation) as a breach of contract claim. Nor does she clearly advance an independent breach of contract claim on appeal. Thus, we do not address whether she could have successfully asserted such a claim.

commissions simply because he believed she owed him. Grant was free to bring claims for alleged unauthorized charges by Jill to seek to offset any liability for breaches of his fiduciary duty. But he brought no such claims, and the trial court made no finding that the funds he took represented sums Jill owed him. Instead, it appears the court rejected Jill's claim because it found that the commission agreement was unusually favorable to Jill in providing her 100 percent of commissions collected. But favorable or not, that is what the parties agreed to, and they did not further agree that Grant could deduct from her commissions any amounts he thought Jill owed him. On remand, the court must determine whether Jill has proved her claim by showing that Grant made unilateral deductions in this category within the limitations period under Code of Civil Procedure section 343.

II. *Support for Jill's Retirement Needs*

Jill contends the trial court erred by rejecting her claim that Grant was required to provide her additional funding for her retirement needs, based on either his reasonable-support obligations under the PMA or his promises during the marriage. Alternatively, she claims the court erred by failing to include Grant's savings and investments in the marital standard of living when setting the amount of spousal support. As explained below, we find no error.

A. *Background*

At trial, Jill testified that during the marriage, she would ask Grant to sell property so he would have more money to provide for the family's needs, but he consistently refused. She recounted: "Grant told me that he was saving for our future. He was paying off his buildings so that he would have income coming from them. . . . [H]e was saving for our future."

45

According to Jill, Grant's statements led her to believe that his reasonable support under the PMA would provide for her future.

In his own testimony, Grant admitted he would tell Jill he was "[t]rying to build wealth for the family" and was "investing for the family's future." He agreed that Jill was "part of the family" at that time. But following the divorce, Grant's wealth "provide[d] for [his] family's security," meaning himself and the parties' two daughters.

The trial court rejected Jill's position that Grant's reasonable-support obligation included a duty to provide her funds for saving and investment. According to the court, when the parties executed the PMA, they did not "contemplate[] that Grant would fund an investment or retirement account for Jill." Nor did Grant's statements that he was saving for the family's future "mean he intended to fund a retirement account of investments for Jill as part of his contractual 'support' obligation." The court added: "Grant suggests that Jill had no real concerns about the reasonableness of his support levels; this explains why she never demanded a wholesale change in the arrangement. It was only when she realized that the PMA would be enforced against her, that she belatedly raised Grant's historical support levels. This might also explain her failure to act all those years."

As for future spousal support, the trial court awarded Jill $15,000 per month "until the death of either party, remarriage of Jill, or further order." It also ordered Grant to maintain a $2 million life insurance policy to ensure continued support for Jill in case he died first. In making these orders, the court surveyed the parties' circumstances and observed that Jill was 61 years old and had "no retirement savings . . . or any significant investments." It found that "the marital standard was upper-middle-class, by

46

Orange County standards," noting the household's income in the last years of the marriage, the parties' relatively modest travel and household expenses, and the features of the family residence, among other considerations. It did not list Grant's savings and investments among the items considered.

B. *Analysis*

The trial court did not err by concluding that Grant was not required to provide Jill additional funding for her retirement needs. Nor did it err by declining to include his savings and investments in the marital standard of living for purposes of setting the amount of spousal support.

First, the PMA did not require Grant to provide for Jill's future retirement needs. Under the PMA, Grant was to "provide for the reasonable support of the parties during their marriage." If the parties remained married during Jill's retirement, Grant would have been required to provide support for her then, too.

Jill argues that "retirement savings are a reasonably necessary expense *during the marriage.*" But even if the language of the PMA is susceptible to this interpretation, the conduct of the parties shows it was not their intent. (*Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 921 ["'[W]hen a contract is ambiguous, a construction given to it by the acts and conduct of the parties . . . , before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court'"])

In this context, the trial court noted Jill's "failure to act all those years" and credited Grant's "suggest[ion] that Jill had no real concerns about the reasonableness of his support levels" during the marriage, which "explain[ed] why she never demanded a wholesale change in the arrangement." We are unpersuaded by Jill's contention that Grant led her to

47

believe that his reasonable support obligation under the PMA extended to her retirement needs: as noted, that obligation expressly applied only "during their marriage." The parties' treatment of Grant's reasonable-support obligations refutes the notion that he was required to provide additional support for Jill's retirement needs. (*Employers Reinsurance Co. v. Superior Court, supra*, 161 Cal.App.4th at p. 921.)

Jill asserts she did not independently save for retirement in reliance on Grant's repeated promises that he was saving for the future of the family, including Jill. She claims that under the promissory estoppel doctrine, Grant was bound to keep these promises, regardless of the PMA. The parties debate whether Jill preserved this contention in the trial court. We need not decide the issue because Jill's argument fails on the merits.

"The elements of a promissory estoppel claim are '(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance.' [Citation.]" (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 901.) It is undisputed that Grant told Jill he was saving for the family's future. As Jill notes, at the time, the family included her. But Grant's statements could not be reasonably understood to assure Jill that he was saving for her future needs even if they divorced and she was therefore no longer part of his family. He certainly made no clear and unambiguous promise to do so.

Finally, Jill contends that in awarding spousal support, the trial court was required to consider Grant's separate-property savings and investments to determine Jill's marital standard of living. She cites cases holding that spouses' marital savings history is properly included in the

48

marital standard of living. (*In re Marriage of Wittgrove* (2004)
120 Cal.App.4th 1317, 1329; *In re Marriage of Drapeau* (2001) 93 Cal.App.4th
1086, 1097-1098; *In re Marriage of Winter* (1992) 7 Cal.App.4th 1926, 1932.)
These cases are inapposite because each involved a couple's community-
property savings or the supported spouse's separate savings. (*In re Marriage
of Wittgrove*, at p. 1321 [couple jointly invested about $200,000-$300,000 per
year for savings]; *In re Marriage of Drapeau*, at p. 1096 [parties saved
"significant portions of their income" and supported spouse received benefit of
her "community share in the parties' past savings"]; *In re Marriage of Winter*,
at p. 1931 ["'the parties . . . spent a portion of their money . . . [o]n
invest[ments]'"].) Unlike the supported spouses in these cases, Jill is not
claiming her standard of living during the marriage included her own savings
or community-property savings. She seeks to include Grant's separate-
property investments and savings, from which she did not benefit during the
marriage.[21] She cites no authority requiring family courts to apply this
analysis, and we are aware of none.

We observe that the trial court did not neglect to consider Jill's
retirement needs: it expressly considered the fact that she had "no
retirement savings . . . or any significant investments" and awarded her a
significant amount in monthly spousal support to continue until the death of
either party or Jill's remarriage, while ordering Grant to maintain a $2

---

[21]       Under the PMA, even if the marriage had continued, Grant
would have been free to use the fruits of these investments as he pleased,
subject only to his obligation to provide Jill with reasonable support. His
representation that he was saving for the future of "the family," would not
have been reasonably construed to add to his reasonable-support obligations.
It meant simply that his savings were the means to fund those obligations.

million life insurance policy to ensure continued support for Jill in case he died first. Jill does not claim the court was required to provide more.[22]

III. *Grant's Sole Liability for the Mortgage Debt*

Grant challenges the trial court's ruling assigning him the entire mortgage debt on the parties' jointly owned real property, arguing it did so based on its misinterpretation of the PMA. We conclude the court correctly interpreted and applied the PMA.

A. *Background*

As noted, Jill and Grant took out a mortgage to purchase their jointly owned vacant lot adjacent to the family residence. Both were required signatories on the promissory note, which referred to them together as "'Borrower.'" The note provided that they jointly and severally promised to repay the loan.

The trial court divided this asset equally between the parties. However, the court assigned the entire mortgage debt to Grant, relying on the PMA's indemnification provision. The court concluded this provision required Grant to indemnify Jill for debt she incurred with his express advance consent. In so doing, it rejected Grant's proffered interpretation of the indemnity provision, under which Grant was required to indemnify Jill for debt she incurred only if he gave express advance consent to indemnify her.

B. *Analysis*

The trial court correctly assigned the entire mortgage debt to Grant under the PMA. The PMA required Grant to "indemnify Jill from and against any and all debts incurred during the marriage by him or by her with

---

[22] We do not preclude the trial court from reconsidering the amount of spousal support in light of its changes to the original judgment on remand.

50

his express advance consent." Under this provision, Grant was to indemnify Jill for certain debts if he gave his express consent for her to incur them—debts she "incurred . . . with his express advance consent."

As he argued below, Grant claims the indemnity provision instructed that he would indemnify Jill only if he gave express advance consent *to indemnify her*. We disagree. Grant's construction would leave a wide gap between the adverbial phrase ("with his express advance consent") and the referent it modified ("indemnify"), skipping over a closer reasonable referent ("incurred"). That is a strained interpretation that conflicts with an applicable canon of construction: "'qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote.'" (*White v. County of Sacramento* (1982) 31 Cal.3d 676, 680.) We therefore reject Grant's proffered interpretation of the PMA.

In his reply brief, Grant asserts for the first time that there was no evidence he "*expressly* consented to Jill's choice to undertake the [mortgage] debt." His failure to raise this assertion in his opening brief deprived Jill of an opportunity to address it and therefore forfeited his contention. (*Browne v. County of Tehama* (2013) 213 Cal.App.4th 704, 726 [failure to raise contention in opening brief constitutes forfeiture]). Moreover, Grant's signing of the promissory note shows he expressly consented to Jill's choice to undertake the debt. The note provided that Grant and Jill jointly and severally promised to pay, and it required the signature of both of them as the "Borrower." Grant's signature indicated his agreement to the terms of the note, which included Jill's undertaking of the debt. Accordingly, the trial court did not err by assigning Grant sole liability for the mortgage.

51

IV. *Jill's Obligation to Reimburse Grant for Her Housing While They Were Separated*

Jill claims the trial court erred by ordering her to reimburse Grant for occupying the marital residence during the seven months in which the parties were separated but still married (the separation period). She contends the PMA required Grant to provide her with housing during that period. As discussed below, we agree.

A. *Background*

When the parties separated in late December 2015, Grant moved out of the marital home, which he solely owned. Jill continued to reside at the home through the separation period and for some time after the judgment of dissolution, entered in early August 2016.

Grant claimed Jill must reimburse him for her sole use of the residence from the date of separation. Opposing this claim, Jill asked the court to exercise discretion to deny the requested relief because, inter alia, Grant had not informed her when he moved out that he expected her to pay him for her use of the home. Ultimately, the court accepted Grant's claim and ordered Jill to reimburse him for her exclusive occupancy from the time of separation.

B. *Analysis*

The trial court erred by requiring Jill to reimburse Grant for occupying the marital residence during the separation period.[23] The PMA required Grant to "provide for the reasonable support of the parties *during their marriage*" so that it "shall not be necessary for Jill to use any of her

---

[23] We do not fault the trial court for its ruling, as it appears Jill did not raise this contention before it. We nevertheless consider the issue and conclude the court erred on this issue of law, as Grant does not argue that Jill failed to preserve it for appeal.

property for such purpose." (Italics added.) It is undisputed Grant's reasonable-support obligation included the duty to provide Jill with housing. Because the parties were still married during the separation period, this housing requirement continued in force during this period, meaning the court should not have ordered Jill to pay Grant for residing in the marital home.[24]

Grant argues the phrase "during their marriage" in the PMA is ordinarily understood to mean "while living together as spouses." We are unpersuaded.

California law defines when a marriage ends: "Marriage is dissolved only by one of the following: [¶] (a) The death of one of the parties. [¶] (b) A judgment of dissolution of marriage. [¶] (c) A judgment of nullity of marriage." (§ 310.) Common parlance, too, distinguishes between being "divorced" or "unmarried" and being merely "separated." In the PMA, the parties selected the duration of the "marriage," rather than their cohabitation as spouses, as the basis for Grant's support obligations.

This choice made practical sense. Basing support obligations on cohabitation could raise questions about the precise date on which parties ceased cohabitating. Moreover, it is not uncommon for married couples to physically separate, only to later resume their marital relations. In that scenario, basing support obligations on cohabitation could raise questions about retroactive application. The parties' reference to the duration of the marriage provided a bright-line rule and avoided these questions.

Grant cites California law's definition of the date of separation: "the date that a complete and final break in the marital relationship has

---

[24] Grant does not contend that Jill's exclusive use of the home exceeded his obligation to provide her with housing, and we do not consider the issue.

53

occurred," evidenced by a spouse's expression of "intent to end the marriage" and conduct consistent with that intent. (§ 70, subd. (a).) This definition does not support his position because it concerns the complete and final break in the marital *relationship*, rather than the *marriage*. (*Ibid.*) Moreover, under this definition, the date of separation depends on a spouse's current "intent" to end the marriage, highlighting that the marriage is still in force at that time. (*Ibid.*) Because the parties were married during the separation period, Grant's support obligation remained in force, and the trial court erred by requiring her to reimburse him for occupying the family residence during that time.

V. *Attorney Fees and Costs*

Jill challenges the trial court's award of contractual attorney fees to Grant, claiming the court erred by finding that Grant was the prevailing party on the PMA. She also challenges the amount of its award of fees to her under section 2030, contending the court erred by limiting the award based on the merits of her claims.

As discussed below, the trial court must reconsider the issue of contractual attorney fees in light of the ultimate judgment on remand. As for fees under section 2030, the court did not abuse its discretion by withholding fees for claims it concluded were baseless and for attorney services it found not reasonably necessary.

A. *Background*

Following the judgment, the trial court considered the parties' respective requests for attorney fees and costs. Each party sought contractual fees as a prevailing party under the PMA's attorney fees

provision and Civil Code section 1717.[25]  The court determined that Grant was the prevailing party in defending the validity of the PMA.  It rejected Jill's contention that based on her partial success in the next stages of the litigation, either she was entitled to fees as the prevailing party in enforcing the PMA or no one was entitled to fees because both parties prevailed.  The court found that Jill's successful fiduciary duty claims were not contractual claims for fee purposes.  It also concluded that her other successful claim (the mortgage claim) was minor in relation to her primary litigation objection— enforcing the PMA's reasonable-support requirements.  The court therefore awarded Grant over $261,000 in contractual attorney fees.

Next, Jill sought at least $1.5 million in attorney fees and costs under section 2030.[26]  The trial court awarded her $890,000 in fees and costs under this provision, limiting the award based in part on "the enormous costs [Jill incurred] in attempting to achieve a largely unobtainable result."  It stated that Jill tasked her counsel with "achieving the unachievable" and found that most of the theories presented on the merits of her claims were "not viable."  In this context, the court noted Jill's challenges to the PMA's validity, her claim that the PMA required Grant to fund her retirement needs, and other claims relating to Grant's separate property.  It further observed that due in part to a request by Jill, there were as many as four

---

[25]     As explained further below, under Civil Code section 1717, subdivision (a), in "any action on a contract," where the contract provides for attorney fees and costs to the prevailing party, that party is entitled to reasonable fees and costs.

[26]     As discussed below, section 2030 affords the trial court discretion to order one party to pay the other "reasonably necessary" attorney fees and costs based in part on the parties' financial circumstances.  (§ 2030, subd. (a)(1)-(2).)

attorneys at her table during trial, compared to just one at Grant's. It concluded Grant should not fully fund this "extra support requested by [Jill]."[27]

B. *Contractual Fees for Grant*

1. *Governing Principles*

Civil Code Section 1717, subdivision (a) provides in relevant part: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded . . . to the prevailing party, then the party who is determined to be the party prevailing on the contract . . . shall be entitled to reasonable attorney's fees in addition to other costs." Under subdivision (b)(1) of the statute, generally, "the party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract," and "[t]he court may also determine that there is no party prevailing on the contract for purposes of this section." "The trial court ruling on a motion for fees under section 1717 is vested with discretion in determining which party has prevailed on the contract, or that no party has." (*DisputeSuite.com, LLC v. Scoreinc.com* (2017) 2 Cal.5th 968, 973.)

"'[I]n deciding whether there is a "party prevailing on the contract," the trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their

---

[27]     The trial court also denied Grant's request for sanctions under section 271, subdivision (a), which permits an award of fees and costs based on the extent to which the parties' conduct "furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation." The court found that "[g]iven the result of their lengthy contested proceedings, it cannot be said that one party was re[sponsible] for the exorbitant costs of litigation."

litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources.'" (*DisputeSuite.com, LLC v. Scoreinc.com, supra*, 2 Cal.5th at p. 974.) "An action (or cause of action) is 'on a contract' for purposes of [Civil Code] section 1717 if . . . the action (or cause of action) 'involves' an agreement, in the sense that the action (or cause of action) arises out of, is based upon, or relates to an agreement by seeking to define or interpret its terms or to determine or enforce a party's rights or duties under the agreement . . . ." (*Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.* (2012) 211 Cal.App.4th 230, 241-242.)

2. *Analysis*

Because our decision modifies the trial court's decision on PMA-related claims, such as Jill's obligation to pay Grant for housing during the separation period, the court must reconsider its finding that Grant was the prevailing party for purposes of attorney fees under the PMA. We nevertheless address some of the parties' arguments to provide guidance for the court on remand.

Jill contends, and we agree, that her claims for breach of fiduciary duty based on Grant's improper deductions from her commission are contractual claims for purposes of Civil Code section 1717 and the PMA. Absent the PMA, Jill's commissions would not have been her separate property, and her fiduciary duty claims against Grant could not have existed in their current form. Because her claims enforced her rights to her separate property under the PMA, they were claims on a contract for purposes of Civil Code section 1717, subdivision (a). (*Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc., supra*, 211 Cal.App.4th at pp. 241-242.)

Grant contends Jill's claims were not claims on a contract because his fiduciary duty was imposed by statute and was not based on the

57

PMA. But it was Jill's entitlement to her separate-property earnings under the PMA that gave that duty substance and defined the scope of Grant's breach. Accordingly, on remand, the trial court must compare Grant's success in enforcing the PMA and defending against Jill's PMA-related claims to the extent of Jill's success on her fiduciary duty claims, as well as the mortgage claim and the separation-period housing claim.[28]

C. *Fees and Costs for Jill Under Section 2030*

1. *Governing Principles*

Section 2030 grants the trial court discretion to order one party to pay the other "reasonably necessary" attorney fees and costs based on the parties' abilities to pay and their respective incomes and needs to "ensure that each party has access to legal representation." (§ 2030, subd. (a)(1)-(2).) An award under section 2030 must be "just and reasonable under the relative circumstances of the respective parties." (§ 2032, subd. (a).) "Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances." (§ 2032, subd. (b).)

"The court should limit an award to fees that were reasonably necessary, including by taking into account overlitigation. [Citation.] "'The exercise of sound discretion by the trial court in the matter of attorney's fees includes also judicial evaluation of whether counsel's skill and effort were

---

[28]     Jill asserts the trial court must also consider her victory on a threshold jurisdictional question, which allowed her to bring her fiduciary duty claims. But that procedural success mattered only to the extent it led to success on her substantive claims, which the court must already consider. A procedural win will generally be only a means to obtain the litigation objectives that the court must assess, not an objective unto itself. Thus, the court need not consider Jill's procedural success in analyzing contractual attorney fees on remand.

58

wisely devoted to the expeditious disposition of the case.'" [Citation.] '[S]ervices which have no apparent effect other than to prolong and to complicate domestic litigation cannot be deemed "reasonably necessary" [citation] "to properly litigate the controversy.'" [Citation.]" (*In re Marriage of Turkanis & Price* (2013) 213 Cal.App.4th 332, 356.)

We review the denial of attorney fees under section 2030 for abuse of discretion. (*In re Marriage of Nakamoto & Hsu* (2022) 79 Cal.App.5th 457, 469.) We review underlying findings of fact for substantial evidence and conclusions of law de novo. (*Ibid.*)

2. *Analysis*

The trial court did not abuse its discretion in setting the award of fees and costs under section 2030. The court did not itemize its award by issue, but its statement of decision reflected reductions for excessive use of attorney hours and for litigation of baseless claims. The court noted that due in part to Jill's request, there were as many as four attorneys at her table during trial, compared to just one at Grant's. It concluded Grant should not fully fund this "extra support." Jill does not contest this analysis.

The trial court also determined that Jill litigated meritless claims, including her challenges to the PMA's validity, her claim that the PMA required Grant to fund her retirement needs, and claims relating to Grant's separate property. In connection with these issues, the court found Jill had tasked her attorneys with "achieving the unachievable" and that her counsel advanced nonviable theories.

Jill claims this was not a proper basis to withhold fees because "'[t]he aim [of a section 2030 award] is *not* to "reward" the winner or "punish" the loser.' [Citation.]" (Quoting Hogoboom et al., Cal. Practice Guide: Family Law (The Rutter Group 2022) ¶ 14:155.) But the trial court did not

limit the award of fees for Jill based on her degree of success; rather, it limited the award of fees expended on groundless claims and other unreasonable expenditures, consistent with California law. (*In re Marriage of Turkanis & Price, supra*, 213 Cal.App.4th at p. 356.)

Jill argues that both her challenge to the validity of the PMA and her retirement-support claim were arguable, if ultimately unsuccessful, and thus she should have received fees for her counsel's related work. The trial court was entitled to conclude otherwise based on the evidence before it.

As to Jill's challenge to the PMA, the statement of decision on the agreement's validity shows she made groundless contentions. For instance, Jill testified that she did not read the agreement before signing it, even though, as the trial court found, the PMA showed that she herself corrected a typographical error in it and initialed the correction. And whereas Jill asserted that the PMA was unconscionable, the trial court identified no substantive unconscionability—it concluded the PMA favored Jill—and no procedural unconscionability—it noted that Jill had been advised by independent counsel, made no attempt to negotiate the terms, and followed the PMA without objection for almost 30 years.

As for Jill's retirement-support claim, as discussed above, the parties' implementation of Grant's reasonable-support obligations throughout their marriage rendered her claim untenable. (*Employers Reinsurance Co. v. Superior Court, supra*, 161 Cal.App.4th at p. 921.) Jill does not address the other claims the trial court referenced in concluding she attempted to "achiev[e] the unachievable." In short, the court did not abuse its discretion in setting the amount of fees it awarded Jill under section 2030.

60

## DISPOSITION

The trial court's judgments are affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. On remand, the court shall, in addition to any other task it deems appropriate: (1) determine which of Jill's tax-withholding claims were timely under Code of Civil Procedure section 343; (2) calculate her damages for the timely claims and consider whether it should award prejudgment interest; (3) determine whether Jill has proved her claims concerning Grant's deductions for her personal expenses by showing that he made unilateral deductions in this category within the limitations period; (4) modify the judgment to reflect that Jill was not required to reimburse Grant for occupying the marital home during the separation period; and (5) reconsider its determination that Grant was the prevailing party on the PMA in light of changes to the judgment and the guidance provided in this opinion. The parties shall bear their own costs on appeal.


O'LEARY, P. J.

WE CONCUR:


GOETHALS, J.


GOODING, J.


61